**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| ROBIN RAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:12-cv-00395-TWP-MJD |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on the State of Indiana's ("State") Motion for Summary Judgment (Dkt. 65). This dispute stems from an array of allegations made by Plaintiff Robin Ray ("Ms. Ray") against her employer. Ms. Ray alleges race and sex discrimination and that she was demoted in retaliation for reporting sexual harassment of female employees and others by male employees and because she had two children in an interracial relationship. The State alleges that Ms. Ray led "a soap opera life" which was widely known and that she was not demoted based upon discrimination or in retaliation, but instead, for breaching confidentiality requirements and violating directives. For the reasons set forth below, the Motion is **GRANTED**.

**I. BACKGROUND**

**A.     Ms. Ray's Employment and Demotions**

The following facts are undisputed and considered in the light most favorable to Ms. Ray, the non-moving party. The alleged events took place at the Madison Correctional Facility ("MCF") and adjacent facilities, which are part of the Indiana Department of Correction. In September 2006, Ms. Ray, a Caucasian female, began working at MCF as a correctional officer.

In 2007, she entered into a relationship with Daniel Todd ("Mr. Todd"), an African-American, and she became pregnant. At the time, a fellow staff member made a racial comment about Ms. Ray's baby and Ms. Ray complained. In November 2008, Ms. Ray was promoted to sergeant within MCF. In 2009, Ms. Ray became pregnant again by Mr. Todd. During this time period, Ms. Ray confided in her supervisor, Superintendent Jan Davis ("Ms. Davis"), with details about her relationship with Mr. Todd, such as he was a binge drinker, that the two fought, and he had impregnated another woman. After learning of Ms. Ray's second pregnancy with Mr. Todd, Ms. Davis told Ms. Ray she was disappointed in her. Also in 2009, Ms. Ray attended correctional police training, which she finished in February 2010.

In September 2010, Ms. Ray began a sexual relationship with Shawn Smith ("Mr. Smith"), an Internal Affairs ("IA") Officer for the Madison Correctional Juvenile Facility ("MCJF"). Mr. Smith had been training or advising Ms. Ray and the two became close. In addition to his duties at the juvenile facility, Mr. Smith also served on a panel that considered Ms. Ray for a promotion to the position of IA officer for MCF. Mr. Smith was not, however, one of Ms. Ray's supervisors. Ms. Ray felt coerced into beginning the sexual relationship with Mr. Smith, but she did not report or complain about the relationship to anyone at MCF until several months after it ended. Ms. Ray broke off the relationship with Mr. Smith in December 2010 because she felt uncomfortable with the situation.

The State has limited state housing on the grounds of MCF. In November 2010, Ms. Ray requested to stay in the state housing apartments located on the MCF compound. Ms. Davis secured an apartment for Ms. Ray and her children, but verbally required that Mr. Todd not be present on facility grounds. Ms. Ray believes the agreement was that Mr. Todd could not live in the state apartment. On December 1, 2010, Ms. Ray filed for and received a protective order

against Mr. Todd. In the protective order Ms. Ray stated under oath that Mr. Todd had shoved into her knocking her to the side, on numerous dates had sent excessive text and telephone messages (i.e., on November 12, 2010 Mr. Todd sent 123 texts and called her cell phone 57 times), and on two occasions she had called police to the scene of incidents involving Mr. Todd. On December 8, 2010, police were called to Ms. Ray's state apartment after she reported her Health Savings Account card had been stolen.

In January 2011, after Ms. Ray had broken off her relationship with Mr. Smith, she was promoted to an IA officer position. Around that time the protective order against Mr. Todd was withdrawn and a visitation agreement was worked out in state court whereby Mr. Todd would have parenting time and would babysit the children in Ms. Ray's home until he had suitable arrangements for the children to visit him.

In February 2011, Ms. Ray made a sexual harassment complaint to Human Resources due to the sexual relationship with Mr. Smith. There is no evidence of an investigation or resolution.

In March 2011, Ms. Davis was told that Mr. Todd had visited and was living in Ms. Ray's state apartment. Ms. Davis confronted Ms. Ray, who admitted that Mr. Todd had been in her apartment, but denied that he was living there. Mr. Todd had stayed overnight on at least two occasions and would sometimes babysit at the state apartment. Ms. Davis believed Ms. Ray had broken their agreement and this resulted in insubordination. A pre-deprivation hearing was held before Captain John Carman ("Mr. Carman"), Lieutenant Scott Sedam ("Mr. Sedam"), and a third employee. The panel determined Ms. Ray had been insubordinate by having Mr. Todd at the state apartment contrary to Ms. Davis's orders, and also that Ms. Ray had divulged confidential information to Mr. Todd. As a result, they found that Ms. Ray should be demoted to

the sergeant position. Thereafter on March 7, 2011, Ms. Davis gave Ms. Ray notice of the termination of her lease in state housing.

On March 23, 2011, an MCF staff member told Ms. Davis and Mr. Sedam about a video taken by an MCF employee, Rob Howerton ("Mr. Howerton"), of Ms. Ray and MCF employee Jessica Bradley ("Ms. Bradley"). The video was recorded at Wal-Mart during work hours; Ms. Ray was in her officer's uniform on the video. In the video, Mr. Howerton says "go" and the women speak, including saying "titties and beer, titties and beer, at Rob's house." An investigation into the video was launched, and Mr. Sedam and Mr. Carman held pre-deprivation hearings with the three employees involved. Mr. Howerton was initially reluctant to admit his involvement but did admit he recorded the video and he received a written reprimand. Ms. Bradley admitted her involvement and received a written reprimand. Ms. Ray initially denied involvement in the video and continued to minimize her involvement in the video. Thus, for her sanction, Mr. Carman recommended she be demoted from sergeant to correctional officer due to her failure to accept responsibility, past discipline, and that she was wearing her uniform during the incident, which took place in a public store. After the demotion, Ms. Ray requested and was moved to a caseworker position at MCF.

**B.     Additional Relevant Events**

Sometime in late 2009, MCJF employees Mark Pitcher ("Mr. Pitcher"), and Michael Gilbert ("Mr. Gilbert") were socializing after hours at a hotel with fellow and subordinate employees Jennifer Hoffman Duncan ("Ms. Duncan") and Laura Meyer ("Ms. Meyer"). Mr. Smith was also present. Mr. Pitcher and Ms. Duncan had sex in the bathroom, and Ms. Duncan was told by other employees that Mr. Smith had video recorded the incident. Ms. Meyer and

4

Ms. Duncan told Ms. Ray about the incident and Ms. Ray made a complaint of sexual harassment to Mr. Carman.

In December 2010, Ms. Duncan and Ms. Meyer filed sexual harassment complaints at MCJF stemming from the 2009 incident. Complaints of staff-to-staff sexual harassment were forwarded to the State Personnel Department and were not handled by IA or Human Resources. After the investigation, Mr. Pitcher and Mr. Gilbert were demoted to correctional officer positions and were transferred to different facilities.

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted). Finally, "neither the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the

material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted).

### III. DISCUSSION

**A.  Evidentiary Disputes**

The parties voice many objections over the evidence submitted by the opposing side in this case. When considering a motion for summary judgment, the court considers only admissible evidence. *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). The Court agrees with both parties that some evidence submitted is objectionable. With that in mind, the Court has reviewed the evidence and relies only that which is admissible and material.

**B.  Discrimination Claims**

Whether race or sex discrimination is alleged, the legal analysis is the same. It is well-established that a plaintiff may prove discrimination in one of two ways: either through direct evidence, or indirectly through the burden-shifting mechanism of *McDonnell Douglas*.[1] *See Stewart v. Henderson*, 207 F.3d 374, 376 (7th Cir. 2000). Under the direct method, a plaintiff may proffer direct or circumstantial evidence to prove discrimination. Direct evidence "requires an admission of discriminatory intent." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 979 (7th Cir. 2014). A plaintiff may also prevail under the direct method by constructing a "convincing mosaic" of circumstantial evidence that "allows a jury to infer intentional discrimination by the decision maker." *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (citation and

---

[1] Ms. Ray is correct that the Seventh Circuit has considered the problems with the direct/indirect paradigm, and has suggested moving toward a more flexible totality of the circumstances approach. The Seventh Circuit has recently clarified, however, that "[w]hile this approach is being considered, the Court has continued to look at the factors embodied in the traditional tests to determine whether plaintiff has succeeded in creating a genuine issue of material fact." *Chaib v. Indiana*, __ F.3d __, 2014 WL 685274, at *4 (7th Cir. Feb. 24, 2014).

internal quotations omitted). "That circumstantial evidence, however, must point directly to a discriminatory reason for the employer's action." *Id*. (citation and internal quotations omitted).

Alternatively, a plaintiff can use the indirect method of proof, which consists of three basic steps: (1) a plaintiff must establish a *prima facie* case of discrimination based on sex or race; (2) if she does so, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for the adverse action; and (3) the plaintiff must then come forward and show the stated reason is pretextual. *See Henderson*, 207 F.3d at 376. A plaintiff establishes a *prima facie* case by establishing evidence that would allow a reasonable jury to find on each claim that: (1) she is a member of the protected class; (2) she met her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of the protected class were treated more favorably. *Chaib*, 2014 WL 685274, at *4.

### 1. Sex Discrimination

The Court finds that under either approach, Ms. Ray has failed to support her sex discrimination claim. First, there is insufficient circumstantial evidence pointing to proof of intentional discrimination. *See Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1029 (7th Cir. 2003) ("Proof of intentional discrimination is required under a disparate treatment analysis."). Ms. Ray points to no evidence that creates a disputed issue of fact that Ms. Davis or members of the pre-deprivation panels that demoted Ms. Ray were motivated because of sexual bias. There is a complete absence of evidence suggesting that her sex played any role in the decision-making.

Second, Ms. Ray cannot establish a *prima facie* case under the indirect method, because she has not identified similarly situated employees outside of her class that were treated more

favorably. When determining a similarly situated employee, the "purpose is to eliminate other possible explanatory variables, such as different roles, performance histories, or decision-making personnel, which help isolate the critical independent variable—discriminatory animus." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (internal quotation marks omitted). Regarding the housing situation, Ms. Ray identifies two men, including Donald Benko ("Mr. Benko"), a maintenance man who was terminated for unknown reasons, but who had a tumultuous relationship with his girlfriend who lived with him in state housing. She also identified Superintendent Tim Greathouse ("Mr. Greathouse"), who lived in state housing with his fiancé. Both men had substantially different roles than Ms. Ray, as well as decision-making personnel. There is also no evidence that either of these men had a similar relationship history which led to their supervisor's imposing an additional requirement that their significant other stay away from or not live in state housing. Neither can Ms. Ray identify a similarly situated employee regarding the video. Mr. Howerton, the only man who was disciplined for the video, did not have a similar disciplinary history. Ms. Ray mentions a man who showed the video to others, but his involvement in the video is not similar enough to Ms. Ray's—who participated in the actual filming at a public location in her officer uniform—and Ms. Ray provides scant detail that would allow the Court to determine otherwise. Ms. Ray has failed to identify employees who are "directly comparable to the plaintiff in all material respects." *Id.* (internal quotation marks omitted).

Third, even if Ms. Ray could satisfy a *prima facie* case, the State has produced a legitimate non-discriminatory reason for its actions and she cannot show pretext. Pretext means more than a plaintiff's disagreement with their employer's decision. "It is not the court's concern that an employer may be wrong about its employee's performance, or may be too hard

8

on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." *Naik v. Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 601 (7th Cir. 2010). As mentioned above, there is no evidence that the decision-makers were motivated by Ms. Ray's sex when she was demoted on either occasion. Thus, the State's motion for summary judgment on the sex discrimination claim is **GRANTED**.

### 2. Race Discrimination

The Seventh Circuit has not decided the question of whether "discriminating against a person because they are involved in an interracial relationship constitutes race discrimination." *Ineichen v. Ameritech*, 410 F.3d 956, 961 (7th Cir. 2005); *see Ellis v. United Parcel Serv., Inc.*, 523 F.3d 823, 826 (7th Cir. 2008); *Rihm v. Hancock Cnty. Pub. Library*, No. 1:12-cv-01474-RLY-TAB, 2013 WL 6238627, at *3 (S.D. Ind. Dec. 3, 2013). However, district courts in this Circuit have allowed claims to proceed based on discrimination due to an association with a member of a protected class. *See, e.g.*, *Rihm*, 2013 WL 6238627, at *3 (listing cases). Further, the State does not contend that Ms. Ray's claim must fail on this basis, so the Court will assume for purposes of the motion that such a claim may proceed.

Ms. Ray has failed to make out a case of race discrimination under the direct method. While the facts indicate that Ms. Davis did not like Mr. Todd and disapproved of Ms. Ray's relationship with him, there is no evidence that Ms. Davis had a problem with the relationship because Ms. Ray was Caucasian and Mr. Todd was African-American. Ms. Ray confided details to Ms. Davis about her relationship, and like in *Ineichen*, the evidence shows that Ms. Davis had an independent basis for her opinion—that Ms. Ray's relationship with Mr. Todd was volatile and unfaithful, Mr. Todd was a binge drinker who could not maintain employment, and that Ms. Ray sought a protective order against Mr. Todd. *See Ineichen*, 410 F.3d at 962 (finding that

9

supervisor disapproved of the relationship because it affected the employee's productivity, not because the relationship was interracial). Ms. Ray could not recall Ms. Davis ever commenting on Mr. Todd's race or the race of Ms. Ray's children. Clearly, there is no direct evidence of any racial animus.

As for circumstantial evidence, Ms. Ray references her 2007 complaint to Ms. Davis about another employee using the term "nigger baby," and Ms. Davis did not follow up with Ms. Ray after the complaint was made. This complaint was made approximately three years prior to the housing incident and, without more, does not establish Ms. Davis's bias. Ms. Ray only assumes Ms. Davis did not act on the complaint, but there is no indication that Ms. Ray ever heard any racial terms after 2007. Additionally, Ms. Ray concludes that Ms. Davis did not like Mr. Todd and that Ms. Ray was treated differently than others in non-interracial relationships. She believes the only explanation for these conclusions is Mr. Todd's race. But to reach such conclusions requires an unreasonable inference not supported by evidence. *See St. Louis N. Joint Venture v. P & L Enters., Inc.*, 116 F.3d 262, 265 n.2 (7th Cir. 1997) ("[T]he court is not required to draw unreasonable inferences from the evidence."). As discussed above, Ms. Davis had detailed knowledge about Ms. Ray's and Mr. Todd's relationship and the evidence supports a reasonable inference that her dislike for Mr. Todd and motivation to keep Mr. Todd out of state housing was race-neutral.

Ms. Ray's claim also fails under the indirect method. First, she has not identified similarly situated employees treated more favorably. Ms. Ray identifies Mr. Greathouse, Ms. Davis, Assistant Superintendent of the Madison State Hospital Carolyn Copeland ("Ms. Copeland"), and Mr. Benko. Ms. Ray argues that Ms. Davis can be compared, despite Ms. Davis having a supervisory role over Ms. Ray. *See* Dkt. 95 at 40 (citing *Ezell v. Potter*, 400 F.3d 1041

(7th Cir. 2005)). Yet the case cited by Ms. Ray does not support the proposition stated. Rather, Seventh Circuit case law requires that comparators should be "similar enough to enable a meaningful comparison." *Coleman*, 667 F.3d at 848. Ms. Davis, Mr. Greathouse, and Ms. Copeland are not similar enough to Ms. Ray for meaningful comparison. They are not subject to the same standards, and Mr. Greathouse and Ms. Copeland are in different facilities—the juvenile facility—with very different job duties than Ms. Ray. As noted above, Mr. Benko, the maintenance worker, had a different role and different decision-makers. Thus, Ms. Ray fails to meet the similarly situated prong.

Even if Ms. Ray could make a *prima facie* case, she cannot establish that the reason for her demotion was pretext. Ms. Ray and Ms. Davis verbally agreed that Mr. Todd was not allowed to live in the state apartment. When Ms. Davis found out that Mr. Todd had been visiting the state apartment and stayed overnight on one or two occasions, she instituted a disciplinary action against Ms. Ray that included a pre-deprivation hearing. The pre-deprivation panel determined that Ms. Ray had been insubordinate by breaking the verbal agreement with Ms. Davis, and so Ms. Ray was demoted. Ms. Ray must show that the finding of insubordination was pretext for discrimination. It is not enough to argue that she did not break the agreement because Mr. Todd was not living there. "Evidence that an employer made a mistake or that the decision was ill-advised cannot meet [the pretext] burden; an employer's explanation is a pretext for discrimination only if it is a lie." *Ellis*, 523 F.3d at 829. The Court is sympathetic to Ms. Ray's position regarding the alleged unfairness of her state housing situation. But this cannot sustain a finding of pretext. However ill-advised or harsh Ms. Davis's requirement that Mr. Todd could not visit Ms. Ray's state apartment, the evidence does not support Ms. Ray's claim that racial discrimination was the true cause. Additionally, there are no allegations that the panel

members, Mr. Carman and Mr. Sedam, did not believe that Ms. Ray had been insubordinate and should be demoted. Thus, there is no pretext and Ms. Ray's claim fails. The State's motion on this claim is **GRANTED**.

**C.    Retaliation Claim**

Although Ms. Ray's discrimination claims fail, she may still pursue her claims for retaliation. "Unlawful retaliation occurs when an employer takes an adverse employment action against an employee for opposing impermissible discrimination." *Rogers v. City of Chi.*, 320 F.3d 748, 753 (7th Cir. 2003) (citations omitted). Discrimination and retaliation claims are distinct, and "a claim of retaliation does not depend on proof that any status-based discrimination actually occurred." *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 460 (2008).

As with a discrimination claim, a plaintiff asserting a claim of retaliation may choose to prove her case under either direct or indirect methods of proof. *See Barton v. Zimmer, Inc.*, 662 F.3d 448, 455–56 (7th Cir. 2011); *Weber v. Univs. Research Ass'n, Inc.*, 621 F.3d 589, 592 (7th Cir. 2010). Under the direct method, the plaintiff must present evidence that (1) she engaged in a statutorily protected activity; (2) she suffered a materially adverse action; and (3) a causal connection exists between the protected activity and the adverse action. *Argyropoulos v. City of Alton*, 539 F.3d 724, 733 (7th Cir. 2008). Ms. Ray does not offer evidence under the indirect method, but only offers circumstantial evidence to support her claim.

The Court accepts that Ms. Ray engaged in statutorily protected activity by making a complaint after the conclusion of her affair with Mr. Smith in 2011, and in early 2010 about the incident involving Ms. Duncan and Ms. Meyer. However, the 2010 complaint cannot logically serve as the basis of her claim, since after that complaint she was sent to correctional police training school and received a promotion. Conversely, after her 2011 complaint, Ms. Ray did

suffer an adverse employment action when she was demoted from IA to sergeant.[2] But, Ms. Ray's claim fails at the third prong, as she cannot establish a causal connection between the two. "A causal link between the protected expression and an adverse employment action may be established by showing that the protected conduct was a substantial or motivating factor in the employer's decision." *Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005).

Ms. Ray argues that the "timing in this case of the actions against Ray are very close to the time of Ray stopping sex with Smith and to the demotion and transfer of Smith's friends." Dkt. 95 at 45. Ms. Ray was promoted to IA in January 2011. She reported her affair with Mr. Smith in February 2011. She was evicted from state housing in March 2011. On the face of the evidence, the timing is suspicious. However, suspicious timing is rarely sufficient in and of itself to create an issue of fact for the jury. *Culver*, 416 F.3d at 545. Suspicious timing loses its effect when, as here, the decision-maker is unaware of the complaints. *See id.* ("When an adverse employment action follows close on the heels of protected expression and the plaintiff can show the person who decided to impose the adverse action knew of the protected conduct, the causation element of the *prima facie* case is typically satisfied."). There is no evidence that Ms. Davis, Mr. Carman, and Mr. Sedam knew of the complaint regarding the sexual affair with Mr. Smith, at the time Ms. Ray was demoted. Further, the demotion was more proximately related to Ms. Davis being told that Mr. Todd was visiting Ms. Ray's state apartment and staying overnight. Ms. Ray argues that because it was Mr. Smith who complained about Mr. Todd's presence, he was retaliating against her to keep her quiet. Even if Mr. Smith had a retaliatory motive, he was not a decision-maker for Ms. Ray's demotion, and Ms. Ray admitted that Mr. Todd had been visiting the apartment and stayed once or twice overnight. Ms. Ray has not tied

---

[2] In Ms. Ray's Response in Opposition, she does not assert that her demotion from sergeant to correctional officer as a result of the video incident was retaliatory. Thus, the Court considers any such claim abandoned.

her allegations of retaliation to the decision-makers who controlled her employment status. As such, she cannot show that she was demoted out of retaliatory animus. Therefore, the State's motion on this claim is also **GRANTED**.

## IV. <u>CONCLUSION</u>

Accordingly, the State's Motion for Summary Judgment (Dkt. 65) is **GRANTED**. Ms. Ray's claims are **DISMISSED with prejudice**.

**SO ORDERED.**

Date: 03/12/2014

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Richard L. Darst
COHEN GARELICK & GLAZIER
rdarst@cgglawfirm.com

Laura Lee Bowker
OFFICE OF THE ATTORNEY GENERAL
laura.bowker@atg.in.gov

Grant E. Helms
OFFICE OF THE ATTORNEY GENERAL
Grant.Helms@atg.in.gov